OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Ronald Sansom, filed December 5, 2007. On June 14, 2007, Sansom was indicted on one count of operating a vehicle while under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a)(G)(1)(d), a felony of the fourth degree, along with a specification, R.C. 2941.1413, that Sansom, within 20 years of *Page 2 
committing this offense, previously had been convicted of or pled guilty to five or more equivalent offenses. Sansom pled not guilty, and following a jury trial, Sansom was convicted. Sansom received a 30 month sentence, including a sixty day mandatory provision and an $800.00 fine for operating a vehicle while under the influence of alcohol, and he received a five year mandatory sentence on the specification to count one. The trial court ordered that the sentences be served consecutively for a total sentence of seven years and six months. The trial court also suspended Sansom's license for 15 years.
 {¶ 2} The events giving rise this matter began on April 29, 2007, at approximately 2:15 a.m., when Officer Jade Michael Cooper of the Urbana Police Division observed Sansom, in his vehicle and stopped at a traffic light, on West Court Street in Urbana. When the light turned green, Sansom did not pull forward for 10 or 20 seconds, until the driver of a second vehicle behind Sansom's honked his horn at Sansom. Cooper, who was behind the second vehicle, then observed that Sansom "sped off rapidly, turning left and making a wide left turn on North Main Street from West Court Street. When he made the turn, he went out so wide that he went into the parking spaces along the east side of North Main Street and continued northbound on North Main Street." Cooper testified that Sansom then made another wide right turn onto East Church Street, going left of center as he completed the turn.
 {¶ 3} Cooper initiated a traffic stop in the one hundred block of East Church Street, and Sansom came to a stop in the two hundred block, two houses from Sansom's residence. When Cooper approached Sansom's vehicle and engaged him in conversation, Cooper immediately noticed "a strong odor of alcoholic beverage." Sansom's eyes were glassy and his speech was slurred. He was wearing glasses at the time. Sansom indicated to Cooper that he *Page 3 
had consumed a couple of drinks. Sansom had difficulty removing his driver's license from his wallet. When asked for his registration, Sansom removed several papers from the glove box, one of which, Cooper observed, was the registration. Samson, however, searched through all the papers repeatedly, and he ultimately gave Cooper the title to his car, but not the registration.
 {¶ 4} Cooper stated that Sansom had difficulty getting out of the vehicle, and that he "used the truck door as he climbed out of the vehicle to assist himself. As he walked around the vehicle and walked to the curve [sic] with me, he tripped over the curve [sic]. I had to catch his arm to keep him from falling to assist him so that he didn't fall to the ground."
 {¶ 5} Cooper administered a horizontal gaze nystagmus test to Sansom. Nystagmus is an involuntary jerking of the eyeball; the consumption of alcohol and certain other drugs hinders the brain's ability to control the muscles of the eye, resulting in jerking eye movements. In administering the test, Cooper had Sansom follow a pencil light with his gaze, looking for lack of smooth pursuit, for distinct nystagmus at maximum deviation, and for the onset of nystagmus prior to 45 degrees in each eye, for a total of six clues of impairment. Cooper tested each eye twice. Cooper observed involuntary jerking in each eye in each phase of the tests.
 {¶ 6} Cooper testified that he received training from a State highway patrol officer in the administration of the horizontal gaze nystagmus test. Cooper indicated he follows the National Highway Safety Guidelines when administering the test. Cooper testified that he has never known of a situation where all six clues are present and the subject was not under the influence of alcohol or drugs. Cooper stated that the test is 77% accurate.
 {¶ 7} Cooper then began the instruction portion of another field sobriety test, the walk-and-turn *Page 4 
test. When he asked Sansom if he wished to complete the test, Sansom, whose residence was just up the street, told Cooper that he wanted his wife to be present while he completed the test, and he asked Cooper to go and get her. When Cooper refused, Sansom declined to complete the test. Sansom also refused to take a breathalyzer test at the police station. Cooper advised Sansom that a refusal to submit to a breathalyzer test results in an automatic suspension of his driver's license, and he presented Cooper with a form to sign acknowledging that he was so advised. Sansom refused to sign the form.
 {¶ 8} Officer Kenneth Jason Kizer of the Urbana Police Division testified that he assisted Cooper in the arrest of Sansom. According to Kizer, when he arrived at the scene, Cooper and Sansom were out of their vehicles, standing on the sidewalk. Kizer walked up behind Sansom, "because he was very unsteady and kind of swaying back and forth. There was a smell — a heavy odor of alcoholic beverage at that point." Kizer remained "standing behind him just to make sure he didn't fall down and hurt himself." Kizer did not observe the horizontal gaze nystagmus test, and he did not look closely at Sansom's eyes, but he did note that Sansom had very slurred speech.
 {¶ 9} Danny Willis, a friend of Sansom's, also testified. According to Willis, who lives on South Main Street in Urbana, Sansom walked to Willis' home on the evening of April 28, 2007, at approximately 11:30 p.m., having previously been at Bracken's, an Urbana bar.
 {¶ 10} Sansom left his pick up truck at Bracken's. Willis was watching the movie Star Wars, and he testified that Sansom stayed at his home until the movie ended, at approximately 1:30 or 2:00 in the morning. Willis testified that he made a pot of coffee and shared it with Sansom. Willis stated that he did not notice anything unusual about Sansom's behavior, and he *Page 5 
could not tell if Sansom had been drinking. Willis stated that he himself "used to drink," but that he has not had a drink in over three years.
 {¶ 11} Finally, Sansom testified. He stated that he was employed at Johnson's Welding Products, where he operated a "CC" machine. Sansom stated he became acquainted with Willis because Sansom's fiancee, Amanda Terrell, is the daughter of a friend of Willis'. Sansom stated he has two children with Amanda, and another son from a previous relationship. Sansom stated that he left his home around 9:00 or 9:30 in the evening on April 28th to visit with a friend with whom he works at Johnson's Welding Products, who also bartends part-time at Bracken's bar. While at the bar, Sansom testified that he had two Michelob beers over the course of two hours.
 {¶ 12} Sansom testified that he walked to Willis' home around 11:30 p.m., "to try to get some exercise" due to back problems. According to Sansom, Bracken's is three blocks from his residence, and Willis' home is three blocks from Bracken's. Sansom stated that he had three fairly large cups of coffee while he and Willis watched the Star Wars movie. After couple of hours, Sansom returned to Bracken's to get his vehicle and proceed home. Sansom admitted that he failed to observe the light turn green as he waited on West Court Street, but he disagreed with Cooper's approximation that 10 or 20 seconds elapsed before Sansom pulled forward. Sansom testified that he made "just a regular left turn" onto North Main Street. Regarding his turn onto East Church Street, Sansom testified, "in the evening at that time of night there's always cars parked on both sides of the road so you have to pretty much make a turn into the middle of the road to make a turn."
 {¶ 13} Sansom did not realize Cooper was behind him until the officer turned on his *Page 6 
overhead lights, and Sansom initially "was thinking maybe [Cooper] was going to an accident or something." Sansom stated that he had no reason to believe that Cooper was coming after him, and he pulled over at the first available spot "to let him go by." Sansom stopped two houses from the home he shared with Amanda.
 {¶ 14} Sansom stated that Cooper told him he stopped Sansom because he was left of center. According to Sansom, he has a partial dental plate that "makes it sometimes sound like you're slurring your speech." Sansom removed his plate to show it to the jury at trial. Sansom stated that he did not have trouble removing his license from his wallet, but he admitted giving Cooper his title and not his registration. Sansom denied stumbling when he got out of the car, and he said he has "three bulging herniated disks" in his back due to a work-related injury. According to Sansom, "if I sit for a long period of time and then you gotta get up and try to move around, it takes a while to get adjusted." Sansom stated, at the time of the horizontal nystagmus gaze test, he had also consumed caffeine, nicotine and aspirin. Sansom stated that, after Cooper instructed him on the walk-and-turn test, Sansom "told him about my back problem. The heel-to-toe, I have difficulty doing that."
 {¶ 15} When asked why he refused the breathalyzer test, Sansom replied that he had read "different articles," and "if the calibrations on the breathalyzers aren't correct or are out of proportion in any way, it would affect the results of the test." According to Sansom, he "didn't want to take the test. It's just as simple as that." While Sansom told the jury initially that he had never previously refused to take a breathalyzer, on cross-examination he admitted that he refused the test on at least two prior occasions. Sansom stipulated to five previous convictions *Page 7 
for operating a vehicle under the influence of alcohol.[1]
 {¶ 16} Sansom asserts one assignment of error as follows:
 {¶ 17} "THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF OPERATING A MOTOR VEHICLE WHILE UNDER THE INFLUENCE OF ALCOHOL."
 {¶ 18} Sansom argues that his conviction was against the manifest weight of the evidence, and he challenges the sufficiency of the evidence to support his conviction.
 {¶ 19} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v. Dossett, Montgomery App. No. 20997,2006-Ohio-3367.
 {¶ 20} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. State v.DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to
Specifically, case numbers 2001-TRC-2945, 1998-TRC-3401, and 1998-TRC-2314, in Champaign County Municipal Court; case numbers 1993-TC-07095 and 1991-TC-02471, in Clark County Municipal Court. *Page 8 
credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 21} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 22} "In reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. McKnight, 107 Ohio St.3d 101, 112, 837 N.E.2d 315,2005-Ohio-6046 (Internal citations omitted).
 {¶ 23} According to Sansom, Cooper's observations regarding Sansom's glassy eyes and slurred speech are suspect because the officer was unfamiliar with Sansom's eyes' normal appearance and Sansom's speech as affected by his partial plate. Sansom further challenges the results of the horizontal gaze nystagmus test, because "caffeine, nicotine and aspirin can cause the nystagmus onset and the officer did not properly use the pen in the smooth pursuit test, as the pen is supposed to be stopped once jerking on the eye is detected."
 {¶ 24} Having thoroughly reviewed the record, weighed all of the evidence and all the reasonable inferences, and considered the credibility of the witnesses, we cannot determine that the jury clearly lost its way and created such a manifest miscarriage that a new trial is warranted, or that any rational trier of fact could not have found the essential elements of the offense of driving a vehicle under the influence of alcohol proven beyond a reasonable doubt. Sansom *Page 9 
admitted that he was unaware that the light had changed until the driver behind him honked his horn. The jury clearly believed Cooper's testimony that Sansom's driving was appreciably impaired since he went left of center, made wide turns as well as impeded the vehicle behind him at a green light. The jury also credited Cooper's and Kizer's consistent testimony regarding the officers' observations of Sansom's condition, namely that he smelled strongly of alcohol, had trouble retrieving his wallet, failed to produce his registration, struggled to exit the vehicle, stumbled over the curb, slurred his speech and failed the horizontal gaze nystagmus test, and we rely upon the jury's assessment of witness credibility. Further, while Sansom explained that he has trouble getting up after sitting for long periods of time, he had difficulty exiting his vehicle shortly after he walked three blocks to his car specifically to "try to get some exercise."
 {¶ 25} Cooper is an experienced police officer, and there is nothing in the record, other than Sansom's allegations, to suggest that Cooper improperly administered the horizontal gaze nystagmus test. Even if the jury rejected the results of the test as unreliable, the jury could have reasonably inferred that Sansom was impaired since he refused to submit to tests that may have established his innocence, had he merely had two beers more than two hours before the tests were offered. The jury could reasonably infer his refusal to submit to testing was to avoid a test result that indicated a prohibited level of alcohol in his system. The jury could also reasonably infer that Sansom declined to sign the form indicating that he had been advised of the resultant automatic license suspension for failure to submit to the breathalyzer because he feared that his handwriting would indicate impairment.
 {¶ 26} We note, Sansom was wearing his partial plate at trial, and there is no indication that his speech was affected by it. The jury could have further reasonably questioned Sansom's *Page 10 
credibility after he stated on direct examination that he had not previously refused a breathalyzer test but then admitted on cross-examination to doing so at least twice.
 {¶ 27} Since Sansom's conviction is not against the manifest weight of the evidence and is supported by sufficient evidence, Sansom's sole assignment of error is overruled. Judgment affirmed.
FAIN, J. and GRADY, J., concur.
[1] Specifically, case numbers 2001-TRC-2945, 1998-TRC-3401, and 1998-TRC-2314, in Champaign County Municipal Court; case numbers 1993-TC-07095 and 1991-TC-02471, in Clark County Municipal Court. *Page 1